## Planters' Bank, Appellant, *v.* Neely *et al.*

It seems that the loss of a bill of exceptions taken in a cause, is not a good ground for
a re-hearing, after the elapse of the term at which the judgment was rendered.

The probate court has power to set aside an administrator's sale on the ground of fraud.

Where by the fraud and deceit of the administrator, the property of the estate did not
bring more than one-fifth of its appraised value at the sale, and the purchaser had
paid out no money for the property, the court of probate set the sale aside.

APPEAL from the probate court of the county of Claiborne.

Letters of administration *de bonis non* were granted to John
G. Neely and wife, on the estate of William King, in August, 1840,
and appraisers appointed to appraise the estate, which was returned
at the October term, 1840, amounting to twenty-one thousand two
hundred and six dollars, eighty-seven cents, including about fifty
slaves, old and young; at which term of the court it was ordered
that the administrators have leave to sell the personal estate, upon
giving the usual public notice of time and place of sale. The
administrators gave notice, and sold the property on the 14th of
December, 1840.

At the December term of the court, 1840, the Planters' Bank
filed a petition in the probate court, alleging that William King
died largely indebted to them as an indorser on a note made by
B. M. Steadman & Co. for thirty thousand dollars, and that said
Neely had by an abuse of the order of sale, sacrificed the estate
by a sale at a price inadequate, insomuch as to show an intent to
cover the estate by a false and pretended sale, and thereby hinder
the collection of debts; wherefore they objected to the sale, prayed
that it might be set aside, and the said Neely cited to appear at
the next term of the court and show cause why the sale should
not be set aside. The petition was received and filed, and Neely
cited to appear and show cause why it should not be set aside, and
witnesses summoned.

At the January term of the court, 1841, the sale was set aside by the court, on proof as the order says, but what proof the record did not show, except that certain facts were proven to the satisfaction of the court, such as inadequate price, collusion and fraud. At the February term, 1841, of the court, John G. Neely and Jane his wife, petitioned the court for a re-hearing of the rule, to show cause for setting aside said sale, upon which the court made the following order in the case, to wit:

"And the court having heard evidence of the facts stated in said petition, and being satisfied of the truth thereof, and the matters being argued by counsel of said administrators and of said Planters' Bank, it is ordered that the petition be recorded, and that the order made at the last term of the court setting aside said sale be vacated, and that a re-hearing of said rule to show cause be granted, and had at the next term of the court." The petition showed, that, in obedience to the order of the court, the administrators, on the 14th of December, 1840, did sell the personal estate, and reported the same to court at December term, 1840; at which time the Planters' Bank appeared and showed cause and obtained a rule on the administrators to show cause at January term, 1841, why the sale should not be set aside; that at January term, 1841, the administrators appeared and offered and showed cause against setting aside the sale, that witnesses were examined on both sides, and the testimony reduced to writing with a view to an appeal; that after hearing the cause, the court ordered the sale set aside for fraud and collusion in said sale; that at the said January term the petitioners demanded an appeal, which was granted upon their entering into bond; that they then presented to the court a bill of exceptions, embodying the testimony then taken down in writing, which was signed by the court. That on the day after the adjournment of court it was discovered that the bill of exceptions and testimony had been abstracted from the clerk's office, or otherwise lost, and could not be found; that no testimony remained in the clerk's office, and no means of supplying it; that petitioners would be deprived of their appeal without it, and without a rehearing. That no evidence had been given on hearing of said rule to show fraud or collusion on the part of the petitioners or purchasers at said sale; that the decree convicting them of collu-

sion and fraud was not sustained by any evidence before the court.

The foregoing is the substance of the petition for a re-hearing of the rule, which was granted, on proof to the satisfaction of the court of the truth thereof. The petition was sworn to in open court. The rule, or re-hearing, was continued from term to term of the probate court, until the August term, 1841, when the report of the sales of the estate of William King, deceased, came on to be heard, and the acceptance and ratification thereof opposed by the Planters' Bank. The testimony was as follows, in substance:

William Briscoe, on the part of the bank, deposed that John Neely and his wife reside one mile from the late residence of Wm. King. On the morning of the sale John G. Neely came to the house of witness, stated the sale would take place that day at King's late residence; that Judge Stamps was coming to attend it, and would probably expect it at his (Neely's) house; requested witness to accompany Stamps, and entertain him with a view to prevent his attending the sale; witness objected. Neely insisted upon his going however to take dinner; that Mrs. Neely was preparing dinner. Witness went alone, and found Judge Stamps there about eleven A. M. and Mr. Sims; that they all remained at Neely's eating and drinking until after dinner. Just before dinner Neely came up with four or five others, and all took dinner together. After dinner witness inquired of Cox when the sale would take place; he replied it had already taken place. The sale was mentioned in conversation before dinner. Mrs. Neely informed Mr. Stamps if he intended to bid, he must be prepared with good security: this was before 12 o'clock. Witness did not know the negroes, but supposed them worth twenty-five thousand dollars. Parmenas Briscoe, the purchaser at the sale, is his brother; lives two miles from him. The value of the other property sold was probably sixteen hundred dollars, but he never saw it. Judge Stamps was agent of Planters' Bank. That at all administrator's sales he ever attended, the price, either high or low, did not affect the validity of sale; that no person generally bid against the widow; that in such case the property would be let remain in the family in preference to letting it go for security debts; that scarcely any person in the neighborhood would bid under the circum-

stances.   Planters' Bank objecting to the testimony, it was over-ruled.   Witness heard nothing said while at Neely's house to pre-vent Judge Stamps from attending the sale, and did not hear him inquire of any one when it would take place.

William D. Sims deposed for the bank, that he went to John Neely's residence to attend the sale, thinking it the place where King had lived.   He understood it occurred at another place, and did not attend the sale; he was led into the mistake from the fact that Neely had married the widow King.   He asked Mrs. Neely if Mr. Neely lived there, and she replied he did.   He informed her that he had understood there was to be a sale there, and some valuable hands sold, and wished to buy some.   She asked witness if he had any particular business with Neely, she would send for Neely.   Witness replied he had none.   He asked her what time the sale would take place.   She replied after 12 o'clock.   He asked where the negroes were.   She replied at the plantation, picking cotton, and would be there after a while.   That Mr. Neely had either gone or sent for them.   Witness heard Mrs. Neely tell Judge Stamps not to be impatient, the sale would not take place before 12 o'clock; that she would not take any advantage of him, but what was honorable.   Mrs. Neely did not inform witness that the sale would take place any where else; witness did not ask her, he was so confident it took place there.   Witness arrived at Neely's fifteen minutes after nine o'clock.   Had he been at the sale he would not have bid, and he so told Judge Stamps that evening; was at Mr. Neely's all the time Judge Stamps was there, and did not hear him make any inquiry when the sale would take place. Witness was informed that the property had been bought in for the children.   P. Briscoe told him he had bought it in for King's children, and that Neely's child had no interest in it.

The Planters' Bank offered to examine Volney Stamps, who answered that he was a stockholder in the bank, and his evidence was ruled out.

William F. Goodin then deposed, that he and Stamps were agents for the Planters' Bank; Volney Stamps is the Judge Stamps spoken of by witnesses.   He left Port Gibson to attend the sale for the bank.   Witness and Stamps, on consultation, were willing to advance twenty-five thousand dollars to go in liquidation of

the debt of King, or fifteen thousand dollars to give security, or ten thousand dollars and pay the cash. Witness never saw the property. The estate of King was sold for four thousand four hundred dollars.

The Planters' Bank having closed their testimony, and the court being satisfied that there was not sufficient time to hear the testimony of the administrators, continued it to the next term, by consent of both parties. At the September term the bank read the evidence of Wm. Briscoe, Sims and Goodin, and called P. Briscoe as a witness, who was ruled out on the ground that the bank had closed her testimony at the last term of the court. Whereupon the court ordered that the report of the sales made 14th December, 1840, pursuant to order of court, by Neely and wife, be confirmed and recorded; from which decision the bank appealed to the High Court of Errors and Appeals. ·

J. H. MAURY for plaintiff in error.

The record presents a statement of facts which in the abstract can start no difference of opinion among honest men. It is impossible to conceive of an administrator contending for the ratification of a sale of his intestate's property for less than one quarter of its value, without discovering an evident intention to betray his trust, by diverting the assets into a channel not contemplated by law. That an estate which was bought on credit, and in fact belongs to the creditor until it is paid for, should nevertheless descend to the widow and the orphan, to the exclusion of the creditors, is a doctrine which is not yet countenanced by law, however it may harmonize with the prevailing sentiments of men. The prevalence of these sentiments may be seen on the pages of future legislation, but while the law remains unchanged and is administered with integrity, the interest of creditors cannot be sacrificed or postponed to that of the distributee. The estate of a dead man is charged before all things with the payment of his debts; and when an administrator is detected in an effort to embezzle the estate, or smuggle it into the possession of others, to the prejudice of creditors, so far from being sustained by the probate court, it should be taken as an imperious signal for his removal from the trust.

As an order of sale is not a matter of course, the record of the probate court should furnish the reasons why it was granted. We are not informed by the record in this case whether it was granted to enable the administrators to provide for the payment of debts, or really to enable them to place the estate beyond the reach of creditors.

The law requires that administrators shall give thirty days' notice of the time and place of sale, by advertisement in three or more public places in the county. Rev. Code, 61. There was no evidence that the administrators of William King made advertisement of the time and place of sale at all, though the record shows that the notice which the public had in some way obtained was, in the opinion of the administrator, calculated to mislead. And that the purpose and policy of the law in requiring notice might be more certainly defeated, he solicited the aid of William Briscoe, the witness, to delude the bidders as to the place, until the sale should be over. The witness very properly declined a participation in the deception; but Mrs. Neely, the administratrix, is shown to have exercised a sufficiency of diligence and skill to secure the purchase of the property for her own family, without the competition of creditors and bidders. A faithful administrator, intending to make an honest and *bona fide* sale of the estate, in conformity with the duties of his office and the upright purposes of the law, would have sought for the highest prices that could be obtained. And even if he had given notice agreeably to the letter of the law, it was equivalent to no notice, or worse than none, if he knew it was calculated to mislead such as desired to attend the same. Mrs. Neely, the administratrix, knew that Mr. Stamps, the agent of the bank, and Mr. Sims had come to her house for the purpose of bidding for the property. She knew that they were mistaken as to the place where the property was to be sold, and she knew that the property was at that moment selling at a different place, while these two bidders, one of whom represented the interest of a large claim on the estate, had gone for the purpose of bidding; and instead of resorting to the practice of dissimulation and device, for the purpose of eluding the competition of their bids, she was bound by every principle of law and moral duty to undeceive them. She and the administrator, her husband,

8*

for the benefit of their own children, deceived and defeated the creditors, the protection of whose interest was the primary duty of their fiduciary station. 2 Kent Com. 415, 420. Toller. 1 Maddox Ch. 578. And the probate judge thought it right to sustain their achievement; convinced of its propriety more probably by the evidence of its conformity with the usages of the country, than by the force or policy of any law that he had read.

The sale reported by the administrators ought to have been rejected by the court, in consequence of the great inadequacy of the price for which the property was sold; and if that were not a sufficient ground, in consequence of the devices practised by them to prevent its selling for a better price.

It is not necessary in this case to rely on the inadequacy of price as sufficient *per se* to set aside the sale. The question is, whether the probate court, which is itself the vendor, 1 Bland. 581, will adopt an *inchoate* sale, reported by an administrator for confirmation, when it is shown that the property will command more than four times the amount offered for it. If a man contract for the sale of his own property, a court of equity will not enforce the contract against him, if the consideration is evidently inadequate. 2 John. Ch. R. 1; 1 Sugden, 258; 2 Litt. 118. A great inadequacy of price is an evidence of a fraud, and if it be corroborated by the slightest circumstances of concealment, misrepresentation or deception, will not only prevent the enforcement of an executory contract in chancery, but will authorize the rescission of a contract actually executed. 1 Bro. Ch. R. 1; 2 Yerger, 294; 2 Litt. 118; Sugden, 258. Beside the gross inequality between the price to be paid and the real value of the property in this case, it is proved by the evidence of William Briscoe that the administrator resorted to measures to prevent the attendance of bidders whom he knew to be deeply interested in the assets of the estate; and that the administratrix, knowing that they had come for the purpose of bidding, concealed from them the fact that the sale was then transpiring at another place, and actually misled them by the tenor of her observations. If these doctrines apply against the enforcement of ordinary sales of property, how much more strongly do they apply in the case of a judicial sale, reported for the acceptance or rejection of the court. All judicial sales

made by authority of an order of court, even in the absence of any circumstance of fraud, will be set aside if the consideration is considerably inadequate, or if a considerable advance is offered on the amount of the purchase money.   American Equity Digest, 586–7.   In the case of Pierson *v.* Collett, 13 Price, 213, the biddings were opened on the offer of an advance of about six per cent.   In the case of Lefroy *v.* Lefroy, 2 Russ. 606, the biddings were opened for an advance of less than five per cent., though the person offering the advance was present at the sale and had an opportunity of bidding.   In the case before the court an advance of six hundred per cent. was offered; by a party, too, who was prevented attending the sale by mistake or accident, if not, indeed, by the contrivance of the administrators.   The property is proven to be worth four times the amount bid for it.   And the Planters' Bank offered to advance on a bid of four thousand dollars the sum of twenty-five thousand dollars, in liquidation of its debt, or fifteen thousand with good security on the customary credit, or ten thousand in ready money.

The remaining points of the case are less important, but not less decisive of the appeal.   The bank, beside proving her unwillingness to advance on the bidding, desired her offer to be entered on record; but was refused the privilege for the convenient reason that the probate judge "could not see what good it would do." He had the goodness, however, to sign the exception.

Objection was made to the admission of evidence to prove the sentiments that prevail at administrator's sales in favor of widows, often to the prejudice of children, and always to the prejudice of creditors.   The court overruled the objection, and admitted the evidence, for the similarly convenient reason, that " he could not see what harm it would do."

The law furnishes no authority for the decision of the court ruling out the evidence of Stamps, on the ground of his being the owner of stock in the Planters' Bank.   It was a controversy in which no right or interest whatever was involved.   The bank, though she objected to the confirmation of the sale, was no more a party to the proceeding than any other creditor or distributee. There was then, and is now, no conflict of interest between the bank and the administrator, that can be so recognised by law.

The bank contended only that the property should be sold for an adequate price, and the administrator cannot be allowed to entertain a wish to the contrary. If the evidence of Stamps was material, it was alike and for the same end favorable to the administrator and the bank. Being offered merely for the purpose of showing the court that higher prices might be obtained, it conflicted with no legitimate interest to the contrary whatever. Neither Stamps or the bank could recover any thing in the controversy, though it might have increased the fund for the payment of debts, and resulted indirectly to their advantage. But would such a result be objectionable from the mouth of an administrator? A creditor is a competent witness for his debtor, though the latter may by his evidence be enabled to recover the means of paying the debt. A child is competent to testify for his father, though his evidence might indirectly increase his expected inheritance. In all cases where the witness is not directly or immediately interested, the objection goes to his credibility, but does not affect his competency. Peake 144; 2 Espinasse's R. 486; 4 Burr. 2251.

The only remaining objection to the proceedings of the probate court is referrable to the order of granting a re-hearing, on the petition of the administrator at a subsequent term, after the sales had been rejected. If the probate court has the power to grant a rehearing of a matter determined at a prior term of the court, it must be by analogy to the practice of courts of chancery; and in that view neither the petition, the time when it was presented, nor the statements which it contains, was such as could authorize the court to grant a re-hearing. 1 Newland's Chancery, 361; 2 Maddox, 482.

MONTGOMERY & BOYD were on the same side.

THRASHER & SELLERS for appellees.

Eight errors have been assigned by the appellants to reverse the decree of the probate court, in confirming the sale of the personal property of William King, deceased, made by the administrator *de bonis non*, on the 14th December, 1840; and although there is but one point in the case which merits the serious consideration of

the court, yet it is deemed but respectful to the counsel, to notice the assignment of errors contained in the record.

The first is, that the probate court erred in granting the original order of sale, without any reason being shown therefor.

The legal presumption is, that every officer and inferior tribunal acting within the scope of their authority, do their duty, until the contrary appears. In the case of the Bank of the United States *v.* Dandridge, Judge Story says; that the law indulges its own presumptions, it presumes that every man both in his private and official character, does his duty until the contrary is proved; it will presume that all things are rightly done, unless the circumstances of the case overturn the presumption, according to the maxim *omnia presumuntur rite et solemitur esse acta donec contrarium.* 12 Wheaton, 69–70; 19 Johnson, 345; 10 East, 211 ; therefore that sufficient reasons were shown to the court to authorize the order of sale.

The law makes the estates of deceased persons liable for their debts. H. & H. 334, sec. 33, and compels the administrator to take an oath, to pay those debts; so far as the property of the deceased will extend, H. & H. 396, sec. 37. The appellants show, or attempt to show, one debt alone of thirty thousand dollars against deceased, and consequently show by record themselves, a sufficient reason to authorize the sale ordered by the probate court.

Second : that the court erred in granting a re-hearing of the order rejecting the sale reported by the administrator at the succeeding term of the court. This depends on the jurisdiction and powers of the probate court, over the subject matter, which all must admit was ample ; according to the provision in the constitution, and the numerous decisions of the High Court of Errors and Appeals on the subject.

Every human jurisdiction without exception, says Du Ponceau, rests on one of three foundations, or on all of them together, to wit : over the place *in locum*, over the person *in personam*, and over the subject *in subjectam materiam*, Du Ponceau on Jurisdiction, p. 21. The jurisdiction of the probate court therefore, rested on the three foundations and was complete. In the case of Blanton *v.* King, the court say, that the powers of a court of pro-

bate, are in every respect as ample, so far as its jurisdiction extends, as those of a court of chancery. 2 Howard, 861, and in Carmichael *v.* Browder *et al.* the powers of the probate court are co-extensive with those of a court of equity, for if necessary, parties may proceed by bill and answer, and the court may decree as the justice of the case may require, 3 Howard, 258. If this be true as a principle, then it is certain that a court of equity would have granted the relief, which the probate court did, (by ordering a rehearing of the order rejecting the report of sale,) upon two well known principles of equity jurisdiction, to wit: that power which a court of chancery exercises, by bill in nature of a bill of review; or by a review of its own decree at a subsequent term, and on such review in reversing the same ; or by bill in the nature of an original bill impeaching and setting aside a decree obtained by fraud, at a former term of the court. Blake's Chancery, 45–46 –47–48; 2 Ves. 36–120 ; 2 P. Wms. 73–74. And secondly, by virtue of that power which a court of chancery exercises in granting new trials at law. 2 Johnson's Ch. Rep. 465; 2 Ib. 230; 6 Ib. 479; 3 Bibb. 80; 4 Desaus. 505–514.

The case at bar (taking into consideration the mysterious manner in which the original testimony and bill of exceptions disappeared,) evidently presents such a case, as would authorize a court of equity, or probate court, to grant a re-hearing of the order or decree rejecting the report of sale, but no exceptions were taken to the order of that court, granting a re-hearing at the time it was made, and none can be taken now.

The report of sales was set aside at the January term 1841. At the February term 1841, the appellees petitioned the court for a re-hearing of the rule, which petition the court granted after hearing evidence and the argument of counsel on both sides. The appellants submitted to the order or decree of the court in granting a re-hearing without excepting, or without taking an appeal at the time, and by consent continued the case for a re-hearing from term to term, until August 1841. When the parties appeared in court, introduced evidence and went into a re-hearing of the case *de novo* by consent, and it is now too late to except for the first time, to the order granting a re-hearing. The case of Wooldridge *v.* Wilkins, 3 Howard, 366, is decisive on this point. In that case

the court say in substance, that after the parties have severally appeared and contested the claim upon its merits, that they cannot go back to the sufficiency of the pleading. 3 Howard, 214, in point.

Third. That the court erred in confirming the sale without proof of advertisement. This assignment of error is not sustained by the record; much less does it exist in point of fact; if it did, the case of Wooldridge *v.* Wilkins, 3 Howard, 366, would preclude the appellants from taking the exception in the appellate court which had not been made in the court below. Legal public notice, of the time and place of sale, was too important a point to be omitted by either party in the probate court; but being admitted at the time by the appellants, it was not made a point in the case; yet the decree or judgment of the probate court shows that the fact was proved. The petition of the appellees for a re-hearing, states that in obedience to the order of the court, that the administrators did on the 14th of December, 1840, sell the personal estate, having given legal public notice of the time and place of sale. The decree of the court is in the following language, to wit: "and the court having heard evidence of the facts stated in said petition, and being satisfied of the truth thereof, and the matters being argued by counsel on both sides," &c. Here then is the solemn evidence of the court, reciting in the decree, that legal public notice of the time and place of sale was proved to the satisfaction of the court, and on this point the appellants were silent in the probate court.

Fourth. That the court erred in confirming the sale contrary to the force of evidence in the case. Some difficulty arises in ascertaining the meaning of counsel, by an assignment of error, so general and indefinite. Legal public notice, of the time and place of sale, was proved, according to the decree of the court. Some attempt was made to prove fraud and collusion on the part of Neely, one of the administrators, but the attempt entirely failed, and most especially did they fail to connect it with the purchaser, or any other person; for aught that appears, the sale was fair and attended by every person which a legal public notice of the time and place of sale would call together, except Volney Stamps and William McD. Sims; and why did not they attend? 'No person

misdirected them; no person misled them.   They went to the family residence of John G. Neely, instead of to the plantation and late residence of Wm. King, and engaged in eating and drinking. They never once inquired where the sale was to take place; by the advertisement they were notified, that it was to take place at the plantation and late residence of Wm. King, deceased.   Wm. King, in his life-time, had never lived at the residence of Neely. Neely's residence was a place · which he had purchased of Moses Graves, situated a mile from the residence of King.   Volney Stamps had resided ten or twelve years in the county; he had been a candidate for office and judge of probate, and was well acquainted in the neighborhood; whose fault was it that he did not attend the sale ? evidently his own, and not that of Neely, with whom he had no communication until after the sale.   Was it the fault of Mrs. Neely?   He never inquired of her, nor did she tell him where it was to take place, because she was not asked that question.   Where then is the fraud? with whom was the collusion?   William Briscoe was asked to accompany the judge and to entertain him; he declined to do so, and did not attend the sale. Mr. Sims would not have bid for the property under the circumstances.   The only attempt at collusion was the suggestion to Wm. Briscoe to accompany Judge Stamps, and to entertain him. This was promptly declined.   A thought, therefore, which was never acted upon, can never constitute a fraud.   Fraud is not to be presumed, but must be proved.

But it is said that the sale ought to be set aside in consequence of inadequacy of price.

It is believed that a single case cannot be found in which it has been held that mere inadequacy of price was a sufficient ground to annul or set aside a sale or contract, fairly made or entered into.   See Fonb. Eq. 127, note D; 5 Ves. 848; 10 do. 209; 2 John. Ch. R. 23; 2 Desaus. 636; 4 do. 687.

Inadequacy of consideration for a contract will not of itself substantiate a charge of fraud.   Chitty on Con. 224; 2 Har. & Gill. 114.

On the one hand, courts of justice have ever endeavored to repress dishonesty; and, on the other hand, they have required

and expected that each party should be vigilant, and exercise a due degree of caution.   2 B. & P. 412.

In the case of Jenkins *et al. v.* Hogg, 2 Cons. Rep. South Car. 821 and 839, the court say—If, at a public sale, the land is knocked off to a fair purchaser at a price greatly below its value, the vendor is bound by it, and the purchaser gets the benefits of his bargain.   Equity is equity, and therefore, if the land is knocked off to a fair bidder at a price which greatly exceeds the value, he must be content to take the purchase.   Am. Ch. Dig. 526.

The doctrine of opening biddings on a sale before the confirmation of the report upon the offer of a reasonable advance on the amount bid, as a general rule, has never been recognized in the American States, but has ever been repudiated and condemned. In the case of Williams *v.* Attleborough, Turner's Rep. 75, Lord Elden says, "During a period of nearly half a century which I have passed in this court, and in which Lord Apsley, Lord Thurlow, the lords commissioners, with Lord Loughborough at their head, then Lord Loughborough as chancellor, and after him the lords commissioners, with Chief Baron Eyre at their head, have presided here, I have heard one and all of them lament that the practice of opening biddings was ever introduced."   2 Paige's Ch. R. 100, 101; 2 McCord, 158.

The fifth, sixth, seventh and eighth errors assigned may all be considered under one head, being exceptions to evidence received by the court, and for evidence ruled out.

A material distinction is taken between illegal evidence admitted to a jury under the direction of a court, and illegal evidence admitted by a court which decides on the subject matter without the intervention of a jury.   In the former case it constitutes error, which will be corrected by an appellate court; but in the latter case it never can be revised by an appellate court, unless the tribunal admitting the illegal testimony base their judgment or decree on the illegal testimony, and specify, in such judgment or decree, the particular testimony upon which the judgment or decree has been based.   If there has been a sufficiency of legal testimony admitted by the court, in such case, to authorize the judgment rendered, an appellate court will never reverse it because illegal testimony has been received or legal testimony rejected,

after the mind of the court has been satisfied. Such is believed to be the acknowledged principle of law, and such is understood to be the opinion of the court in the case of Beach *v.* Luckett, 4 How. 483, in which the court say, "If the testimony had been offered to a jury, the question would be different. Here it was offered to the judge. The object of testimony is to satisfy the mind as to the fact. The judge had heard the positive testimony, and it was for him to determine whether he was satisfied, or whether he would hear further evidence. He must have been, satisfied with the proof before him, and that such proof as that offered could not change his mind, or he would have heard it. The question was one for his determination on the evidence. The influence of such evidence, proposed to a jury, could not be known, and a judge would commit an error to refuse it; but when it is proposed to a judge himself, he is certainly capable of knowing what weight it would have. If he is satisfied that it could have no weight, it cannot be error to refuse to hear it."

But it is said that the court erred in rejecting the testimony of Judge Stamps, who was a stockholder in the Planters' Bank. By the civil law, a member of a corporation could not be a witness in a cause where the corporation was a party. Wood's Civil Law, 308.

Corporators or stockholders are excluded from testifying when they have a direct personal interest, in favor of the party calling them, by virtue of the corporation or otherwise. 1 Paige's Ch. R. 613; 3 Day, 491; 7 Mart. La. R. 69.

The admission of further testimony, after the appellants had closed their testimony, which was the case in relation to the testimony of Briscoe, as the record proves, was a matter of discretion with the court, according to all the authorities on the subject, and therefore was not such an error as could be revised on appeal.

Mr. Justice CLAYTON delivered the opinion of the court.

John G. Neely and wife, as the administrator and administratrix of William King, deceased, procured an order from the probate court of Claiborne county, for the sale of the personal estate of the decedent to pay its debts; and in December, 1840, the sale took place. About fifty-five slaves and other personalty, all of which

had been appraised at the aggregate sum of twenty-one thousand two hundred and six dollars, were sold for the sum of four thousand four hundred dollars. At the December term, 1840, of the said probate court, the Planters' Bank filed a petition, alleging that the estate was largely indebted to it, and praying that the sale might be set aside; and at the January term, 1841, the court did set it aside, upon the ground of fraud, collusion and inadequacy of price. It does not appear from the record that any bill of exceptions was taken at the time, or any appeal prayed. At the following February term, Neely and wife filed a petition for a rehearing, which was granted, and the order made at the previous term, setting aside the sale, was annulled. The petition for a rehearing states that a bill of exceptions, embodying the testimony given in upon the trial at the January term, had been signed by the court, and that they had prayed an appeal, which was granted; but that the day after the adjournment of the court, it was ascertained that the bill of exceptions had been lost, and could never afterwards be found. This allegation was probably the ground on which the rehearing was granted. The cause was continued until the September term of the court, when the sale was confirmed and ordered to be recorded. From this order the case comes by appeal to this court.

As a general rule, a rehearing cannot be granted after the term is passed in which the decree was pronounced. A bill of review is then the only remedy. Hodges *v.* Davis, 4 Hen. & Mun. 400; 1 Caine's Ca. in Er. 96; Dunham *v.* Winans, 2 Paige, 24.

The loss of the bill of exceptions does not, by any means, afford a satisfactory reason for the granting of the rehearing. An appeal had been prayed and granted, by which, if the then appellants had executed the bond as required by law, the court below had lost all jurisdiction of the cause. What was the course proper to be pursued upon the loss of the bill of exceptions, we will not attempt to indicate; but we are satisfied the one taken was not correct. As there are other grounds, however, on which the judgment will be reversed, we shall not dwell upon this.

An administrator is but a trustee, and the assets a trust fund, for the creditors and distributees of an estate. 1 Sto. Eq. 506; Cable *v.* Martin & Bell, 1 How. 561.

Any fraud upon the part of the administrator, which tends to defeat the ends of the trust, will justify the court in declaring his acts void, whenever it can be done without prejudice to the rights of innocent third persons. The title cannot pass unless for the purposes and in the manner prescribed by law. The probate court has the power to watch over the execution of its orders; to see that they are not made the instruments of fraud, and, when they are perverted to improper uses, to set aside the acts done under them. This results from the simple elementary principle that the power of all courts to apply the remedy is co-extensive with its jurisdiction over the subject matter. 4 Kent, 191; 4 John. Ch. R. 609. To hold otherwise, when it has been settled that its jurisdiction in matters of administration is ample and exclusive, would be to declare the utter impotence of the law, and to make the avenue to fraud in the administration of estates as broad and beaten as the public highway. But, in the application of the principle, regard must be had to the time when aid is asked, and to the rights of third persons innocently acquired. If, then, there is fraud in this sale, it must be set aside, as the application for that purpose was made at the earliest practicable day, and there are no third persons whose rights conflict.

The evidence in the record will show that Stamps, who acted as the agent of the Planters' Bank, started to the place of sale with an intention to bid for the property, and that he fell into a strange delusion as to the place of the sale. That the petitioners contributed to create that delusion, and to take advantage of it, is most manifest. The testimony is, that Neely, one of the administrators, on the morning of the sale, called at the house of William Briscoe, one of the witnesses, and told him that Stamps was coming down to attend the sale, and that he would probably expect that the sale would take place at his house, and he requested the witness to wait until Stamps came along, to accompany him to his house, to keep him company, and entertain him with a view to prevent his attending the sale. The witness objected to doing so, but Neely insisted on his going to take dinner; this he did. He arrived there about eleven o'clock, found Stamps and William Sims there, and they all remained at the residence of Neely, eating, drinking and talking until after dinner. Neely returned im-

mediately before dinner, with four or five others; and after dinner the witness inquired when the sale would take place, and was informed that it was over.

Another witness, William Sims, states that he went to the residence of Neely to attend the sale, and to purchase negroes; that he arrived at his house at a quarter past nine o'clock, and was there all the time that Stamps was. The witness asked Mrs. Neely, the administratrix, at what time the sale would take place? she replied after twelve o'clock. He asked for the negroes, as he wished to see them before the sale; she replied that they were picking out cotton; that they would be there after a while, and that Mr. Neely had either gone or sent for them. He heard Mrs. Neely tell Stamps not to be uneasy or impatient, that the sale would not take place before twelve o'clock, and that she would not take any advantage of him, but what was honorable. Stamps was also offered as a witness, but objected to on the score of interest, and excluded.

Thus it appears it was the plan of Neely to decoy Stamps to his house, and to have him entertained there, till the sale was completed. The witness to whom he applied refused to aid him; yet the plan was carried out. Stamps went to the house of Neely, was kindly entertained by one of the parties; was desired not to be impatient; told that no advantage would be taken of him; kept in the belief that he was at the place appointed for the sale, and detained there under that belief until it was concluded. The witness, Sims, who went to purchase slaves, was induced, by the conduct and conversation of Mrs. Neely, to believe that the sale was to take place at Neely's residence, and was likewise detained there till it was over. If, in all this, there was no assertion of falsehood, there was at least a suppression of truth, which equally violates good faith, and avoids all transactions infected by it. Any subtle machinations, whether in words or deeds, designed to circumvent, amounts to a deceit which may be relieved against. Donelson *v.* Young, Meigs, 157; Story's Eq. 200, 213.

There are other circumstances of suspicion, of no little weight, in the case. All the property was purchased by one man, at prices about one-fifth of the appraised value; the purchaser sets up no claim for himself, but alleges, it is said, that he bought for the

9*

children of Mrs. Neely, by her first husband, Mr. King.   In many cases, equity will not permit parties to hold property acquired through the fraud of third persons.   Story's Eq. 258; 14 Ves. 289. Here the purchaser has parted with no money, and stands just as he did before the sale.   It is not possible for the court to wink so hard as not to see the true character of this transaction, and not to perceive in it a contrivance to secure the property to the family, without the slightest regard to the rights of creditors, who had the first claim upon it.

The sale could not lawfully commence till after twelve o'clock; it was concluded, the parties concerned in it went a mile, and dined at an hour so early, that after dinner one of the company inquired when the sale would commence.   He was informed it was over.   Fifty-five slaves, the stock attached to the farm, the crop of corn and fodder, the plantation utensils and household furniture, were all sold in so short a time that one of the witnesses after it was over, asked when it would begin.   The loss was four-fifths of the appraised value, and about the same ratio compared with the advance offered to be made by the Planters' Bank.   Such indiscreet haste and ruinous sacrifice demand that a corrective should be applied.

The last order of the probate court will be reversed, and its first order setting the sale aside, because of fraud, affirmed.

Decree reversed.